# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**T.T.K.,**

        **Plaintiff,**

**-vs-**                     **Case No.  6:04-cv-1678-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

_____

## MEMORANDUM OF DECISION

On behalf of her son, Tyler T. Kaser ["Tyler"], plaintiff Johna Kaser ["Kaser"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for Supplemental Security Income. R. 12. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On October 23, 2001,[1] Kaser applied for Supplemental Security Income benefits (hereinafter "SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416. R. 44-47. The claim was denied at the initial level on May 8, 2002. R. 41-43. A Request for Reconsideration was filed on July 1, 2002. R. 37. The claim was again denied on September 2, 2002. R. 30-33. Thereafter, Kaser timely filed a Request for Hearing. R. 29.

---

[1] Although the ALJ noted that Kaser filed an SSI application on behalf of Tyler on October 23, 2001, it appears Kaser did not sign the application until November 14, 2001 (R. 47). Regardless, the date of application does not affect the issues in this case.

The Honorable Philemina M. Jones, Administrative Law Judge ("ALJ"), held a hearing on March 23, 2004.  R. 395-431.  The hearing lasted approximately 50 minutes, and Kaser was the only person to testify.  *Id.*  On May 26, 2004, the ALJ issued an unfavorable decision.  R. 9-21.  Although the ALJ found that Tyler had not engaged in substantial gainful activity (R. 14) and had a severe impairment (R. 15), benefits were denied because Tyler's impairments did not meet or medically equal the criteria set forth in any impairment in the listings.  R. 20, Findings 3, 6.

Kaser filed a Request for Review of Hearing Decision on July 29, 2004, but presented no new evidence to the Appeals Council.  R. 7-8.  The Appeals Council denied the request for review on September 14, 2004.  R. 4-6.  On November 17, 2004, Kaser timely appealed the final decision to the United States District Court.  Docket No. 1 at 1.  On June 1, 2005, Kaser filed in this Court a memorandum of law in support of her appeal.  Docket No. 12.  On July 26, 2005, the Commissioner filed a memorandum in support of her decision that Tyler was not disabled.  Docket No. 13.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Kaser argues the Commissioner erred in determining that Tyler's medical conditions did not meet or equal Listing of Impairment 107.08 [inherited coagulation disorder], 112.04 [mood disorder], or 112.11 [attention deficit hyperactivity disorder ("ADHD")] when Tyler's treating physicians concluded Tyler's condition met the listings.  The Commissioner counters that substantial evidence supports the ALJ's decision that Tyler was not disabled.

III.     **THE STANDARD OF REVIEW**

A.     **Affirmance**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

B.     **Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42. U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis

for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

## IV.   THE LAW

### A.   The Statute and the Regulations

On August 22, 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act, Pub.L. No. 104-193, 110 Stat. 2105. The Act amended the substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, **which results in marked and severe functional limitations**, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c (a)(3)(D). The statute does not define "marked and severe functional limitations."

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.  42 U.S.C. § 1382c (a)(3)(G).  In making any determination as to the disability of a child, the Commissioner must also make reasonable efforts to ensure an evaluation by a qualified pediatrician or other specialist in a field of medicine appropriate to the child's disability.  42 U.S.C. § 1382c (a)(3)(I).  With respect to a child with mental impairments, however, Congress has specified that the Commissioner must make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable RFC assessment.  42 U.S.C. § 421 (h).

Under express statutory authority, 42 U.S.C. § 405 (a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Part 416, Subpart I; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets, medically equals, or functionally equals the listings" in the Listing of Impairments in appendix 1 of subpart P of part 404.  20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[3]  The regulations set forth the steps used in determining disability for children.  20 C.F.R. § 416.924 states :

> We follow a set order to determine whether you are disabled.  If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings. If you have such an impairment(s), and it meets the duration requirement, we will find that

---

[3]Part B provides medical criteria applicable to children in those instances in which Part A does not give appropriate consideration to the particular disease process in childhood.  *See* Parts A and B, Part 404, Subpart P, App. 1.

you are disabled.  If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924 (a).

The Commissioner applies a three-part test in determining a child's disability.  The first determination is whether the child is working and performing substantial gainful activity.  20 C.F.R. § 416.924 (b).  If the child is not working, the Commissioner determines whether the child suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.924 (c).  If the child suffers from a severe impairment or combination of impairments, the Commissioner then determines whether the child's impairments meet, medically equal, or functionally equal an impairment listed in the listings.  20 C.F.R. § 416.924 (d).  The Commissioner evaluates age, functioning, and other factors in determining whether a child meets a listing.  20 C.F.R. §§ 416.924a - 416.924b.  Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a.  Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning.  20 C.F.R. § 416.926a (a).  There are six areas of functioning to be considered: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and, health and physical well-being.  20 C.F.R. § 416.926a (b)(1).

-8-

**B.**     **The Evaluation of Mental Disorders**

The structure of the mental disorders listings for children under age 19 parallel the structure of the mental disorders listings for adults, but it is modified to reflect the presentation of mental disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation applicable to children.  The listing for mental disorders in children are arranged in eleven diagnostic categories, including attention deficit hyperactivity disorder (112.11).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (motor function, cognitive/communicative function, social function; personal function, and concentration, persistence, or pace).  20 C.F.R. Pt.404, Subpt. P, App. 1.  In most functional areas, there are two alternative methods of documenting the required level of severity: 1.) use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other medical findings.  *Id.*  The use of standardized tests is the preferred method of documentation if such tests are available.  *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function

independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal,  social, cognitive/communicative functioning, and concentration, persistence and pace.  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases, descriptions of the child's activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior

to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these children's sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the child either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

-11-

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in children with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Attention Deficit Hyperactivity Disorder, 20 C.F.R. § Pt. 404, Subpt. P. App. 1, § 112.11, requires:

A.      Medically documented findings of all three of the following:

        1.      Marked inattention; and
        2.      Marked impulsiveness; and
        3.      Marked hyperactivity;

AND

B.      . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P. App.1, § 112.11.  For children (age 3 to attainment of age 18),  Paragraph B2 of 112.02 requires at least two of the following:

a.      Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b.      Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from

-12-

parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c.      Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.      Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P,  App. 1, § 112.02 B. 2.

## C.      <u>Treating Physicians</u>

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Comm'r of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.   20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a

claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### D.   Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security

hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### E.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

-15-

**F.**     **Credibility**

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.      APPLICATION AND ANALYSIS

### A.      The Facts

Tyler was born on May 27, 2000.  R. 44.  Therefore, he was approximately eighteen months old when he first applied for benefits and was three years old at the time of the hearing.  R. 400.  Tyler was attending a special pre-kindergarten class for children with delayed speech.  R. 400.

On September 14, 2001, Tyler was found to be vomiting blood, and was taken to Florida Hospital emergency department.  R. 138.  He was admitted into the pediatric intensive care unit for a transfusion and observation. R. 140.  Dr. Ben Gueddes determined that Tyler had a bleeding gastric ulcer, which appeared to be the source of his bleeding.  R. 135.  Tyler was discharged on Prilosec, and was to be followed up by another doctor.  *Id*.  Tyler was next seen by Dr. Divya-Devi Joshi in the Pediatric Hematology/Oncology Clinic for further diagnostic testing.  R. 340-342.  Dr. Joshi determined that the hematologic abnormalities were caused by mild hemophilia B.  R. 341.  Thereafter, Kaser had to be instructed and educated on the preventative therapeutic measures of hemophilia B.  R. 340.

On December 10, 2001, Tyler presented at the office of Dr. Joshi exhibiting signs of listlessness, refusal to eat, and having a "brown" liquid on his fingers after he sucked them.  R. 333.  Dr. Joshi concluded that Tyler was again suffering with a probable gastric ulcer, possibly bleeding.  R. 334.

Tyler was seen on February 28, 2002, for an eighteen-month examination.  R. 184.  During this evaluation, it was noted that Tyler had some problems with bleeding in his ankle joints, especially his right ankle.  *Id*.  Kaser reported her concern that Tyler was not saying many words.  *Id.*

-17-

In March 2002, Tyler sustained a closed head injury, however a CT scan of his head revealed no definite evidence of an acute intracranial hemorrhage.  R. 160-61,163, see also R. 311.

On April 25, 2002, it was noted that Tyler seemed to favor his right leg, and Dr. Joshi ordered x-rays to be taken.  R. 328, 329.  However, on July 2, 2002, Dr. Joshi indicated that there were no musculoskeletal defects.  R. 325.  Dr. Joshi also indicated that Tyler, from a developmental standpoint, was not talking, including "Mama" or "Dada."  *Id.*

Tyler was tested at the Developmental Center for Infants and Children, which revealed scores that were 1.5 standard deviations below mean or 25% delay in receptive and expressive language. R. 172.  A Family Support Plan apparently was developed pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., which provided speech therapy to help with these issues, and to determine future needs.  R. 175.

On February 28, 2003, it was noted Tyler was a difficult venipuncture stick, and his mother was interested in placing a port for prophylaxis. R. 310.  Thus, on March 12, 2003, Tyler was hospitalized and an Infuse-a-Port was placed in the right subclavian vein.  R. 187.  A nurse visited Tyler from March 15, 2003 through May 11, 2003, to administer his medication, Benefix, and to train the family to administer the medication through the port.  R. 237-266.

The Pre-K Disabilities Diagnostic Team performed additional developmental and behavioral diagnostic testing on March 26, 2003.  R. 218-229.  After the evaluation, it was concluded that Tyler had delays in the areas of Self-Help, Social and Communication Skills. R. 221-222.  Although Tyler was two years and nine months old at the time of this evaluation, his total language scores placed him at the age equivalent of one year and ten months.  R. 225.  Thus, he was assessed with a severe

expressive language disorder and a moderate receptive language delay. R. 228. Furthermore, Tyler had clinically significant scores in the areas of hyperactivity, aggression and depression. *Id*.

On April 1, 2003, Dr. Joshi noted that Tyler was having inadequate response to the factor that he received since the placement of the port. R. 293. Dr. Joshi also noted that Tyler was experiencing frequent bleeds, mostly in his ankle. *Id*. On July 18, 2003, Dr. Joshi stated that Tyler had moderate hemophilia B, and that his lowest FIX level was measured at 5%. R. 379.

Tyler was tested on April 2, 2003, for the Seminole County Public Schools. R. 231-232. The evaluator noted that Tyler needed to "have hand held assistance as he is very fast and does not attend well to verbal directions or safety." R. 232. The evaluator also noted that Tyler did better when asked to listen to directions and to slow down. R. 231. The evaluation concluded that Tyler would not have physical difficulties in the classroom. R. 232. It was further determined that Tyler met the criteria for Developmentally Delayed and language services, and his information was forwarded to Evans Elementary School for development of an Individual Education Plan ("IEP"). R. 233.

SunState Pediatrics evaluated Tyler on May 27, 2003, for Attention Deficit Hyperactivity Disorder ("ADHD"), and determined that he had the condition. R. 165. Tyler was referred to Intervention Services for determination of an individualized treatment plan. R. 385. On June 20, 2003, Tyler was diagnosed as having Disruptive Behavior Disorder Not Otherwise Specified (312.9) and ADHD by history (314.01). R. 385. The treatment plan notes that Tyler had speech delay, poor impulse control, and a global assessment of functioning (hereinafter "GAF") of 35. R. 385.

On September 25, 2003, Intervention Services referred Tyler for a psychiatric/medication evaluation due to the severity of his behaviors and injuries to himself. R. 383. The treatment plan

notes that Tyler had made little progress this review period, but that he had started pre-kindergarten and done well, although his demands were limited.  R. 383.  Tyler was reported as averaging at least 20 tantrums and 25+ aggression daily, and that he had to receive medical attention weekly due to injuries he caused himself during the tantrums.  R. 383.  His primary diagnosis at the time was Disruptive Behavior Disorder Not Otherwise Specified (312.9), and his GAF was still in the 30's.[4] R. 383.

Tyler was seen by Dr. Bhujang, a psychiatrist, on October 30, 2003.  R. 381.  Dr. Bhujang indicated that Tyler appeared with multiple bruises, had an irritable affect, dysphoric mood, limited impulse control, poor attention, impaired concentration, limited insight and judgment, an inability to cope, and exhibited compulsions and obsessions.  R. 381.  Dr. Bhujang diagnosed Tyler as having ADHD Combined Type, Obsessive Compulsive Disorder with Mood Disorder Not Otherwise Specified, and a GAF score of 40. *Id*.  Dr. Bhujang prescribed Adderal and Risperdol.  *Id*.

At a visit with Intervention Services on December 23, 2003, the records note that Tyler had inconsistent progress.  R. 380.  Tyler continued to have 6-10 tantrums daily and 10+ aggressive incidents daily, yet he was doing well at school.  R. 380.

A Progress Summary from Intervention Services dated March 22, 2004, noted that due to Tyler's metabolism, the effects of medication have been limited and they need to be changed on a frequent basis. R. 92.  The Adderal and Risperdal resulted in significant and encouraging change of behavior, but it only lasted for approximately three weeks before the medications became ineffective.

---

[4] The exact GAF score is illegible.

-20-

*Id*.  Thereafter, the aggressive tantrum behaviors increased significantly, requiring daily intervention and continuous supervision due to safety concerns. *Id*.

On April 15, 2004, Dr. Bhujang, the treating psychiatrist,[5] indicated that he had seen Tyler eight times since October, 2003. R. 388.  Dr. Bhujang diagnosed Tyler with ADHD Combined Type, Obsessive Compulsive Disorder, and a Mood Disorder Not Otherwise Specified (to rule out Bipolar Disorder), and opined that his prognosis was guarded due to his multiple conditions, and the further complication of his blood disorder. *Id*.  Tyler was taking Abilify, Prozac, Clonodine, and Ritalin. *Id*. Dr. Bhujang stated that Tyler's condition resulted in "marked inattention," "marked impulsiveness," and "marked hyperactivity."  R. 393.  In response to interrogatories prepared by Tyler's counsel, Dr. Bhujang circled responses on the form indicating that Tyler's condition resulted in the following limitations:

> marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication;
>
> marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of standardized tests;
>
> marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration information from parents or other individuals who have knowledge of the child, when such information is needed and available), and

_____

[5] Dr. Bhujang is Board Certified in Psychiatry by the American Board of Psychiatry and Neurology.  R. 388.

including, if necessary, the results of appropriate standardized tests; and

marked difficulties in maintaining concentration, persistence or pace.

R. 393-94.

Dr. Judith Wall, who is Board Certified in Pediatric Hematology/Oncology, completed a set of interrogatories on April 7, 2004. R. 386-387. Tyler was diagnosed as having Factor 1x Deficiency moderate/mild hemophilia. R. 386. Dr. Wall opined that, although Tyler did not have repeated spontaneous or inappropriate bleeding or hemoarthrosis with joint deformity, his impairment equaled the level of severity of a person having either repeated spontaneous or inappropriate bleeding or hemoarthrosis with joint deformity. R. 387. Dr. Wall stated that the "[b]leeding is not spontaneous, however he bleeds with mild/moderate trauma." R. 387. Kaser's logs revealed that Tyler had bleeds approximately 21 times from March 22, 2002, through March 22, 2004.[6] R. 93-104. Kaser testified that Tyler does not have spontaneous bleeds, but that he could bleed from a bump against the table, a trip and fall, if he twists his ankle, or throwing himself on the ground. R. 412.

Kaser testified that at the time of the hearing, Tyler was attending a special pre-K program at the elementary school with six to twelve children in his class. R. 400, 422. Kaser stated that Tyler's attention span was approximately two and a half minutes according to Progress Reports received from Tyler's school. R. 409. The Progress Reports indicate that Tyler is doing "quite well" at school. *Id.* Kaser does not allow Tyler to play in the front yard because he has a "tendency just to bolt out into the middle of the street…unless you have your hand on him constantly, he's going to be running into

---

[6] Plaintiff contends the number of bleeds was approximately 43 for the time period, but the cited records do not appear to support that figure.

the street." R. 410. Tyler, however, is allowed to play in the back yard as it is enclosed. *Id.*. Tyler will play on the swings or play tag with his siblings, although he was described as being very aggressive toward his siblings. R. 410-11. Tyler is allowed to play with the family dog with supervision (R. 411), but he grabs the dog's collar, tries to pull the dog onto his back legs, pulls the dog's tail, and likes to jump on the dog. R. 421.

Kaser testified that because of his obsessive compulsive disorder, Tyler will throw a tantrum if something is not perfect (*e.g.*, toys lined up correctly, coloring within the lines, wrapping of electrical cords). R. 416-17. These tantrums include throwing things against the wall or windows, or ripping up coloring books. R. 416-17. Kaser also testified that Tyler did not sleep well at night, sleeping only approximately four and one-half hours a night. R. 401, 420. This has caused problems for the family because Tyler will leave his room, including one occasion when he climbed out his bedroom window and ran down the four-lane road where they live. R. 420.

Tyler's pre-K teacher completed a questionnaire on April 13, 2004. R. 125-132. The teacher's report reflects that Tyler is receiving speech/language services and that he has some difficulties communicating directly. R. 125-126. He participates in smaller group activities, but not in larger group activities because his attention wanders. R. 126. In the area of "Attending and Completing Tasks," while Tyler's teacher stated Tyler's attention "wanders at times," he was rated as having "no problem" in 8 of the 12 categories in this area, a "slight problem" in 2 of the 12 categories, and an "obvious problem" in 2 of the 12 categories. R. 127. Tyler follows classroom rules, and has no problem moving about and manipulating objects. R. 129-130. He requires some help in the bathroom on an occasional basis. R. 130.

**B.**     **The Analysis**

Kaser argues the Commissioner erred in determining that Tyler's medical conditions did not meet or equal Listing of Impairment 107.08 [inherited coagulation disorder], 112.04 [mood disorder], or 112.11 [attention deficit hyperactivity disorder ("ADHD")] when Tyler's treating physicians concluded Tyler's condition met the listings.  The Commissioner counters that substantial evidence supports the ALJ's decision that Tyler was not disabled.

1.     **Substantial Evidence Supports the ALJ's Decision that Tyler Did Not Meet or Equal Listing 107.08**

Kaser argues that the ALJ erred in finding that Tyler's condition did not meet or equal Listing of Impairment 107.08.  Specifically, Kaser argues that the ALJ misstates the evidence in reaching her decision.  Alternately, Kaser argues that the ALJ should have called a medical expert to render an opinion on medical equivalency.

The ALJ determined that both Kaser and Tyler's doctor stated that Tyler does not have repeated spontaneous or inappropriate bleeds, which is a requirement for Listing 107.08.  R. 15.  Kaser argues that evidence was presented that Tyler's condition was the medical equivalent of Listing 107.08.  Specifically, Kaser points to Dr. Wall's finding that Tyler bleeds with mild/moderate trauma.  R. 387.  Similarly, Kaser testified that bumping into things could cause bleeding.  R. 414.  The record is clear that the ALJ considered the evidence of Tyler's bleeding when he bumped into things or sustained mild/moderate trauma.  R. 14-15.  The ALJ also considered the occasion when Tyler sustained a closed head injury, but suffered no acute intracranial hemorrhage.  R. 15.  Substantial evidence existed in the record for the ALJ to determine whether Tyler's bleeding was equivalent to "inappropriate bleeds" within the meaning of Listing 107.08.

-24-

Kaser's argument that the ALJ erred by not obtaining an additional medical opinion from a medical expert as required by Social Security Ruling 96-6-p also fails.  The ALJ must obtain an additional medical opinion only under the following circumstances:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Social Security Ruling (SSR) 96-6p,  Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence, 61 Fed. Reg. 34466-01 (July 2, 1996).  In this case, the ALJ did not find that a judgment of equivalence may be reasonable or that the additional medical evidence changed the State Agency findings.  The State Agency physicians had found that Tyler was not disabled on the basis of his hemophilia.  R. 27-28.  Therefore, an additional medical opinion was not required.

The Court must affirm the Commissioner's decision when it is supported by substantial evidence, and there is no misapplication of the law.  The ALJ's determination that Tyler's condition fails to meets or equal the Listing of Impairment 107.08, therefore, is affirmed.

2.     **Substantial Evidence Supports the ALJ's Decision that Tyler Did Not Meet Listing 112.04**

Kaser also challenges the ALJ's finding that Tyler did not meet Listing 112.04.  Specifically, Kaser challenges the ALJ's finding that the record does not support the marked limitation of function as described by Dr. Bhujang.[7]  For the reasons stated below, the ALJ did not err.

Listing 112.04 states in relevant part :

> Mood Disorders: Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:
> 1.  Major depressive syndrome . . .;
> 2.  Manic syndrome . . .; OR
> 3.  Bipolar or cyclothymic syndrome;
> AND
> B. . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in B2 of 112.02.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.04 (emphasis added).  The age group criteria in B2 of Listing 112.02 require at least two of the following: marked impairment in age-appropriate cognitive/communicative function; marked impairment in age appropriate social functioning; marked impairment in age-appropriate personal functioning; and marked difficulties in maintaining concentration, persistence, or pace.  20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02 B.2.

The first step of the analysis is to determine whether Tyler met Part A of Listing 112.04 by having a major depressive syndrome, manic syndrome, or bipolar or cyclothymic syndrome.  There

---

[7] The ALJ's decision refers to "Dr. Bhujama," but it is clear the references are to Dr. Bhujang.

is no evidence in the record that Tyler was diagnosed as having any of these syndromes.  Dr. Bhujang

diagnosed Tyler as having a Mood Disorder Not Otherwise Specified (to rule out Bipolar Disorder)

(R. 388) or a Mood Disorder Not Otherwise Specified.  R. 381.  The diagnostic criteria for a Mood

Disorder Not Otherwise Specified differ from the diagnostic criteria for the syndromes specified in

Part A.[8]  The ALJ decision that Tyler's condition did not meet the criteria of Listing 112.04 (R. 16)

is supported by substantial evidence, and will not be disturbed.

           3.      **Substantial Evidence Supports the ALJ's Decision that Tyler did not Meet Listing 112.11**

Next, Kaser challenges the ALJ's finding that Tyler did not meet Listing 112.11.  Again, Kaser

challenges the ALJ's finding that the record does not support the marked limitation of function as

described by Dr. Bhujang.  For the reasons stated below, the ALJ did not err.

Listing 112.11 states in relevant part:

---

[8]Diagnostic criteria for mental disorders are codified in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  Under DSM-IV 296.90, a Mood Disorder Not Otherwise Specified "includes disorders with mood symptoms that do not meet the criteria for any specific Mood Disorder and in which it is difficult to choose between Depressive Disorder Not Otherwise Specified and Bipolar Disorder Not Otherwise Specified (e.g., acute agitation)."  DSM-IV at 375.  The diagnostic criteria for Depressive Disorder Not Otherwise Specified [DSM-IV 311] includes mental disorders with depressive features that do not meet the criteria for Major Depressive Disorder and other disorders.  DSM-IV at 350.  Examples in an adult include premenstrual dysphoric disorder with symptoms severe enough to markedly interfere with work or usual activities; minor depressive disorder (two but not all five of the items required for Major Depressive Disorder) (definition follows in this footnote); recurrent brief depressive disorder; post-psychotic depressive disorder of Schizophrenia; and a Major Depressive Disorder superimposed on a Delusional Disorder, Psychotic Disorder NOS, or active Schizophrenia; depressive disorders in which the clinician is unable to determine whether it is primary, due to a general medical condition, or substance induced.  DSM-IV at 350.  The diagnostic criteria for DSM-IV 296.3 Major Depressive Disorder are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideation.  The diagnostic criteria for Bipolar Disorder, Most Recent Episode Mixed [DSM-IV 296.6x] is 1.) currently or most recently in a mixed episode; 2.) there has previously been at least one major depressive episode, manic episode, or mixed episode; and 3.) the mood episodes are not better accounted for by other diagnoses.  DSM-IV at 357.

> Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
>
> AND
>
> B. [F]or children (age 3 to attainment of age 18), resulting in at least <u>two</u> of the appropriate age-group criteria in paragraph B2 of 112.02 .

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11 (emphasis added).  As stated above, the age group criteria in B2 of Listing 112.02 require at least two of the following: marked impairment in age-appropriate cognitive/communicative function; marked impairment in age appropriate social functioning; marked impairment in age-appropriate personal functioning; and marked difficulties in maintaining concentration, persistence, or pace.  20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02 B.2.

Although Dr. Bhujang diagnosed Tyler as having ADHD Combined Type (R. 381, 388), the ALJ accorded little weight to Dr. Bhujang's assessment that Tyler was markedly impaired in all areas of functioning because Dr. Bhujang's assessment was inconsistent with Tyler's school records. R. 16. Tyler's school records constitute substantial evidence and are a valid basis to discount Dr. Bhujang's assessment.  The ALJ decision that Tyler's condition did not meet the criteria of Listing 112.11 (R. 16) is supported by substantial evidence, and will not be disturbed.

4.      **Substantial Evidence Supports the ALJ's Decision that Tyler's Condition Was Not Functionally Equal to the Listings**

Even if Tyler's condition does not meet or medically equal the criteria of the listings, he may still be disabled if his condition is functionally equal to the listings.  20 C.F.R. § 416.924 (d).  To

functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning. 20 C.F.R. § 416.926a (a). There are six areas of functioning to be considered: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and, health and physical well-being. 20 C.F.R. § 416.926a (b)(1). The ALJ found Tyler was not limited in moving about and manipulating objects, was markedly limited in the area of health and physical well-being, and was less than markedly limited in all other areas. R. 17-20.

Kaser argues that the ALJ erred by only relying on certain statements from Tyler's teacher in rejecting Dr. Bhujang's assessment. Kaser essentially argues that the weight of the evidence supports a finding of marked impairment. Pl. Br. at 16-17. The Court has reviewed the evidence as a whole, and notes that Tyler displays different behaviors at home and at school. Even if the Court would reach a contrary result as finder of fact, and even if the Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm the decision if it is supported by substantial evidence. The teacher's assessment provides substantial evidence in this case to support the ALJ's decision. Therefore, the finding that Tyler does not have a condition that is functionally equivalent to the listings is affirmed.

## VI.   CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

**DONE** and **ORDERED** in Orlando, Florida on February 8, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

-29-

Copies furnished to:
Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia       30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817